IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

NICHOLAS KNOPICK                                                    PLAINTIFF

v.                                    Case No. 3:11-cv-03010

MICHAEL BREEDLOVE; JODI BREEDLOVE;
SHERIFF ROGER VICKERS;
DEPUTY SHERIFF GEORGE CALDERIA; and
MARION COUNTY, ARKANSAS                                             DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Currently before the Court are a motion for summary judgment (Doc. 49) and brief in support

(Doc. 50) filed by Defendants Sheriff Roger Vickers, Deputy Sheriff George Calderia, and Marion

County, Arkansas; Plaintiff Nicholas Knopick's response in opposition (Doc. 59); and the  moving

parties' reply (Doc. 60).  For the reasons described herein, the motion for summary judgment (Doc.

49) is **DENIED**.

I.      **Background**

This lawsuit arises from a dispute surrounding a lease agreement entered into by Plaintiff

Nicholas Knopick and Defendant Michael Breedlove on or about June 1, 2009.   Knopick agreed to

lease the Bull Shoals Hardware Store in Bull Shoals, Arkansas, to Mr. Breedlove.   Article XIV of

the Lease entitled "Surrender of Premises" provided that "[o]n termination of this lease in course or

by Lessor's action, Lessee shall surrender the leased premises in as good condition as they were in

the beginning of the term, reasonable wear and tear excepted.   All additions, fixtures and

improvements shall become the property of Lessor.   Any personal property of Lessee shall remain

the property of the Lessee."  (Doc. 49-1, p. 4).  The year-long lease agreement ended on June 1,

2010, and thereafter, the parties renegotiated the lease to continue on a month-to-month basis.

On Saturday, August 21, 2010, Mr. Breedlove and his wife, Defendant Jodi Breedlove, worked at the hardware store with Knopick. The Breedloves were present when Knopick locked the store doors at the end of the day. However, sometime the following day, Sunday, August 22, 2010, Knopick and Mr. Breedlove had a conversation in which they discussed their rental agreement. According to Knopick, they agreed that (1) their business relationship was over, (2) Mr. Breedlove's rent would be prorated to Saturday, August 21, 2010, and (3) "the store was going to be secured." (Doc. 58-1, p. 10). Knopick claims he offered to come to town the following day, Monday, August 23, 2010, to let Mr. Breedlove in the store to retrieve his personal belongings. *Id.* at p. 16.

After speaking with Mr. Breedlove, Knopick visited the home of Bull Shoals Police Officer Gary Payton. Knopick told Payton "that he was having trouble with a tenant that was in [the hardware store] and he wanted to lock up the business and he wanted a civil standby there in case some trouble happened." (Doc. 58-8, p. 6). A "civil standby" involves a police officer reporting to a location to "stand by" and not intervene except to keep the peace between citizens involved in a civil dispute.

Payton checked with his superior officer and received authorization to accompany Knopick to the store to perform a civil standby. *Id.* at p. 7. Payton testified that he did not have a conversation with Knopick about whether Mr. Breedlove had been given the proper notice pursuant to Arkansas law prior to being evicted. *Id.* In fact, Payton testified, "[t]o my knowledge it was just [Knopick] was just securing the building, I didn't know he was evicting the very people." *Id.*

When Payton and Knopick arrived at the hardware store, Knopick changed the doorknob and lock on the back door of the store and chained and padlocked the front doors. No one else was

present besides Payton and Knopick when the store was secured in this manner.

From Mr. Breedlove's point of view, he did not agree to the termination of the lease agreement or to the lock-out. Instead, Mr. Breedlove contends that Knopick unilaterally terminated the lease agreement and locked him out of the store contrary to Arkansas Code Annotated § 18-17-704, which requires that written notice be given to a tenant on a month-to-month lease at least thirty days before the termination of the lease. Despite Knopick's assurances, Mr. Breedlove did not trust that Knopick would let him back into the store on Monday to retrieve his belongings. Mr. Breedlove testified, "he'd lied to me so many times in the 14 months, there's no way I could believe a word he said." (Doc. 58-7, p. 48). Mr. Breedlove also remembered telling Knopick he "wanted to get [his] stuff right now . . . ." *Id.* at p. 45.

The following morning, Monday, August 23, 2010, Mr. Breedlove spoke with Bill Stahlman, a former defendant in this case and Justice of the Peace for Marion County. *Id.* at p. 51. Stahlman in turn contacted Defendant Roger Vickers, who is Sheriff of Marion County. Stahlman told Vickers that Mr. Breedlove, a friend of Stahlman's, "ran the hardware store at Bull Shoals and wanted to know about doing a civil standby while he picked up his property from that business." (Doc. 58-10, p. 8). Vickers claimed he did not know Mr. Breedlove personally. *Id.* at p. 9. Vickers also testified that he did not know at the time he spoke with Stahlman that a Bull Shoals police officer had conducted a civil standby at Knopick's request the previous day, when Knopick had padlocked the front doors of the store and changed the locks. *Id.* at p. 12. Further, Vickers was aware that no one from the Sheriff's Department had served Mr. Breedlove with eviction papers, and Vickers believed that Arkansas law required that eviction papers be served before a tenant could be lawfully evicted. *Id.* at pp. 12-13.

Mr. Breedlove testified that he had a separate conversation with Vickers in which Mr. Breedlove explained that he had not received a formal eviction notice, and Vickers then advised, "'He can't do that. We'll let you get your stuff. What time would you like to have a deputy there?'" (Doc. 58-7, pp. 56-57). Mr. Breedlove requested that a deputy be sent to the hardware store at 1:00 p.m. that same day. *Id.* at p. 57.

Vickers then informed Defendant Deputy Sheriff George Calderia about Mr. Breedlove's request for a civil standby at the hardware store. (Doc. 58-10, p. 14). Calderia decided to perform the civil standby himself, not knowing in advance that front doors had been padlocked and the locks on the back door had been changed. (Doc. 58-5, pp. 8-10). Calderia also testified that he did not know either Mr. Breedlove or Knopick personally and knew nothing about the lease agreement between them. *Id.* at pp. 10-11.

When Calderia arrived, he was met by the Breedloves, Mr. Breedlove's father-in-law Broskovac, and a number of other people, including store customers. Knopick was not present, though both Vickers and Calderia had assumed he would be there. Calderia testified, "it's commonplace in civil standbys that sometimes the second party is not there," so his absence did not strike Calderia as out of the ordinary. (Doc. 58-5, p. 10).

At some point, Calderia learned that Mr. Breedlove was unable to open the doors to the store because the locks had been changed. Mr. Breedlove and Broskovac suggested entering the store by removing a piece of metal weather stripping from a roll-up garage-style door in the back. *Id.* at p. 12. Calderia telephoned Vickers to tell him what was going on, informing him that there were "multiple people there" and "the doors were locked, the key didn't work." *Id.* at p. 11. Calderia also told Vickers about Mr. Breedlove's plan to force entry into the store by removing the weather

-4-

stripping from the roll-up door.  (Doc. 58-10, p. 17).  Then Calderia "basically asked [Vickers] what he wanted to do next."  (Doc. 58-5, p. 11).

Vickers told Calderia he would have to hang up and call Calderia back.  *Id.*  In the meantime, everyone at the hardware store waited.  *Id.*  When Vickers contacted Calderia again, Vickers told him that "he'd made a phone call" and had decided to "let Mike and them go ahead and take their belongings out of the building."  *Id.*  Calderia then nodded to Mr. Breedlove. *Id.* at p. 12.  Broskovac testified that Calderia "said it was all right" to take the metal strip off the back door.   (Doc. 58-4, p. 16).

After receiving approval from Calderia, Broskovac proceeded to remove the weather stripping from the roll-up access door and showed Calderia what he had done after the door was opened.  (Doc. 58-5, p. 13).  Vickers admits he was "aware that the weather strip was taken from the back door so they could gain entrance" but assumed that because Mr. Breedlove was the manager of the hardware store, there was "no reason to believe otherwise that he couldn't go in" and did not consider Mr. Breedlove and others' actions to be a "forced entry" of the building.  (Doc. 58-10, p. 16).

Once the back door to the store was opened, the Breedloves, Broskovac, and several other individuals began entering the store and removing items.  Calderia stood outside the building and attempted to take down the names of all persons present, check their identification, and keep a list of items removed from the store.  Even though persons other than Mr. Breedlove were entering the store and removing items, Calderia admits he never obtained proof of purchase or proof of ownership for any of the items that were removed, nor did he view the parties' lease or investigate who owned the property prior to allowing Mr. Breedlove and others to enter the store.  (Doc. 58-5, pp. 10-11,

15-16).  Calderia did not enter the store or touch any property that was leaving the building.

Some time later, Knopick arrived at the store.  As he viewed the scene from inside his vehicle, it appeared to him that the hardware store was being looted.  Calderia confirmed in his deposition that there were multiple vehicles and two trailers present, and a number of people entering and exiting the store.  *Id.* at p. 18.

Knopick did not exit his vehicle but instead drove to the office of Bull Shoals Mayor Bruce Powell to ask for assistance.  Knopick was told that the City of Bull Shoals would not intervene in a matter that was being supervised by the Sheriff's office.  Despite the Mayor's refusal to get the City involved, Knopick called the personal cell phone number of Bull Shoals Police Officer John Thompson and asked Thompson to accompany him to the hardware store.

Some time later, Knopick and Thompson arrived at the hardware store, and Knopick exited his vehicle and approached Calderia, who to Knopick "was obviously the one in charge." (Doc. 58-1, p. 45).  Knopick asked Calderia what was going on and why no one had called him.  According to Knopick, Calderia identified himself and said, "I was instructed by the sheriff to come down here and let these people in."  *Id.* at p. 46.  Even though Knopick objected to the removal of items from the store, he did not "question authority at that point" because two law enforcement officers were present, Calderia and Thompson, and they were both standing by and "not doing anything."  *Id.* at p. 47.  Knopick testified that he felt "helpless" to stop what was "a rather daunting circumstance." *Id.* at p. 46.  He did not object to the Breedloves' removal of items from the store because he felt such objection was futile.  Further, he and the Breedloves did not have a confrontation or even a formal conversation while items were being removed from the store.

After everyone but Knopick and Thompson had left the premises, Knopick entered the store

-6-

and told Thompson that he thought money from the cash register and a laptop computer had been stolen. Mrs. Breedlove admits that she took Knopick's personal laptop after telling Calderia that the laptop was not hers. She claims she needed to borrow the laptop to print out customer bills and business-related documents that Knopick did not allow her to print prior to the lock-out. She returned the laptop to the police department a few days later, which Knopick acknowledges.

The complaint in this case was filed on February 7, 2011, alleging six separate causes of action against multiple Defendants.[1] Knopick informed the Court in his response in opposition to summary judgment that he wished to voluntarily dismiss Vickers and Calderia from the state-law causes of action in Counts IV, V, and VI of the complaint. This voluntary dismissal would leave Vickers, Calderia, and Marion County facing liability only on Count I of the complaint for alleged violations of Knopick's Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.

## II.    Legal Standard

When faced with a summary judgment motion, the burden of proof is placed on the moving party to establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 742 (8th Cir. 2009). The Court must review the facts in the light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable

---

[1] Defendants City of Bull Shoals, William Stahlman, and Michael Breedlove, in his official capacity only, were voluntarily dismissed without prejudice on February 27, 2013. This dismissal left Vickers, Calderia, Marion County, and the Breedloves as the remaining Defendants.

jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    Discussion

### A.    Voluntary Dismissal of Vickers and Calderia from Counts IV-VI

The Court construes in Knopick's response in opposition to the motion for summary judgment a request to voluntarily dismiss Vickers and Calderia from the state-law causes of action in the complaint. *See* Doc. 59, p. 23 ("Knopick does not oppose dismissal of the state court causes of action against County Defendants. Accordingly, this Court should dismiss Counts IV (conspiracy to conversion), V (trespass), and VI (conspiracy to trespass)."). Therefore, pursuant to Federal Rule of Civil Procedure 41(a)(2), Vickers and Calderia are DISMISSED WITHOUT PREJUDICE from Counts IV and VI, and Calderia is DISMISSED WITHOUT PREJUDICE from Count V.

### B.    Section 1983 Claims against Vickers, Calderia, and Marion County

The only claims now pending against Vickers, Calderia, and Marion County are § 1983 claims in Count I of the complaint. Count I alleges that Vickers and Calderia violated Knopick's Fourth and Fourteenth Amendment rights by facilitating or otherwise conducting an illegal entry and search of Knopick's hardware store and an illegal seizure of Knopick's personal property, namely a laptop computer located inside the store, without probable cause, exigent circumstances, or a warrant. Further, Knopick asserts that Marion County is liable under § 1983 for the acts of Vickers and Calderia either pursuant to a municipal policy, practice, or custom, or due to the County's failure to train. *See Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (establishing that a municipality can face liability pursuant to § 1983 on these grounds).

Vickers and Calderia assert on summary judgment that Knopick has only made official-

-8-

capacity claims against them and not individual-capacity claims. "In order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). "Only an express statement that [public officials] are being sued in their individual capacity will suffice to give proper notice to the defendants." *Id.* The Eighth Circuit has cautioned litigants to "clearly indicate both the parties being sued and their capacity in the caption." *Jackson v. Crews*, 873 F.2d 1105, 1107 (8th Cir. 1989); *see also Rollins v. Farmer*, 731 F.2d 533, 536 n.3 (8th Cir. 1984) ("If plaintiff wishes to sue defendants in both capacities, the following language would suffice: Plaintiff sues each and all defendants in both their individual and official capacities.").

Knopick did not include language in the caption of the complaint indicating that Vickers and Calderia were being sued in both their official and individual capacities. Further, even though the "Parties" section of the complaint describes Vickers and Calderia as "adult individuals," and the "Prayer for Relief" section asks for punitive damages collectively "against the individual Defendants" without further specification,[2] the use of the word "individual" in these instances is insufficient to meet the Eighth Circuit's strict pleading standard for subjecting state actors to individual liability. *See Egerdahl v. Hibbing Comm. Coll.*, 72 F.3d 615, 619 (8th Cir. 1995) ("If a plaintiff's complaint is silent about the capacity in which she is suing the defendant we interpret the complaint as including only official capacity claims.").

Knopick argues that, notwithstanding any deficiencies in the complaint, Vickers and Calderia

---

[2] At the time the complaint was filed, other individual defendants besides Vickers, Calderia, and the Breedloves were named.

were aware that Knopick had asserted individual liability claims against them because they pleaded the affirmative defense of qualified immunity in their answer, and qualified immunity is only available to officials in their individual capacities.  The Court observes that Vickers and Calderia asserted the defense of qualified immunity in their answer, but did so with the caveat, "but only if the Court construes Plaintiff's Complaint so as to make this defense applicable," (Doc. 8, p. 3), which to the Court indicates Vickers and Calderia's uncertainty about the nature of the claims made against them.

After due consideration, the Court finds that individual-capacity claims against Vickers and Calderia have not been properly pleaded, at least to a degree of specificity that would satisfy the Eighth Circuit's rigorous pleading standards.  Knopick has anticipated that the Court would make such a ruling and has requested leave to amend his complaint to properly state individual-capacity claims.  Vickers and Calderia oppose granting Knopick leave to amend his complaint because (1) the deadline for amendment has passed, and (2) allowing amendment would result in prejudice to Vickers and Calderia and require "additional time to conduct further discovery concerning the new claims and an opportunity to assert a qualified immunity defense."  (Doc. 60, p. 7).

Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend his pleadings "when justice so requires."  Determining whether to grant or refuse a request to amend is in the sound discretion of the court.  *Nix v. Norman*, 879 F.2d 429, 434 n.3 (8th Cir. 1989).   Here, the Court finds that justice requires the preservation of the individual-capacity claims against Vickers and Calderia, as these claims would not be barred by the doctrine of qualified immunity.  Accordingly, granting leave to amend the complaint to properly assert individual-capacity claims would not be futile, nor would amendment at this juncture in the litigation cause prejudice to

-10-

Defendants.  As a practical matter, Vickers and Calderia have already conducted discovery on the issue of qualified immunity in anticipation of the Court potentially construing such claims against them.  This is evidenced by the fact that in their motion for summary judgment, Vickers and Calderia fully briefed the issue of qualified immunity and asserted that they would be entitled to qualified immunity if the Court construed individual-capacity claims in the complaint.  They attached voluminous deposition transcripts taken from multiple witnesses to support their defense of qualified immunity.  In light of these circumstances, the Court believes that little, if any, further discovery will be required by either party once Knopick amends the complaint to formally assert individual-capacity claims against Vickers and Calderia.

Below the Court will address the merits of the pending motion for summary judgment, beginning with the official-capacity claims made against Vickers and Calderia.  Next, the Court will explain why, once Knopick amends his complaint to properly state individual-capacity claims against Vickers and Calderia, those claims would not be entitled to summary judgment due to the application of qualified immunity.  Finally, the Court will consider Knopick's § 1983 claims against Marion County, Arkansas.

### 1.      Official-Capacity Claims

"A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."  *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official . . . ."  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Therefore, all official-capacity claims against Vickers and Calderia in Count I of the complaint are redundant to claims made against Marion County, and these claims are DISMISSED

WITH PREJUDICE.

        **2.**       **Individual-Capacity Claims**

Although the Court determined that Knopick did not properly state individual-capacity claims against Vickers and Calderia in the complaint, the Court will grant leave to Knopick to amend the complaint to clearly and unambiguously state such claims.  Granting leave to amend would not be futile, as the facts in this case—when construed in Knopick's favor—demonstrate that Vickers and Calderia would not be entitled to qualified immunity.

"Qualified immunity shields a public official from suit for civil damages when his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bernini v. City of St. Paul*, 665 F.3d 997, 1002 (8th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Such immunity applies to police officers engaged in their official duties *unless* the evidence establishes (1) that a plaintiff's constitutional rights were violated, and (2) those rights were so clearly established at the time of the alleged violation that a reasonable officer would have known that his actions were unlawful. *Id.*

 Here, Knopick asserts that his Fourth and Fourteenth Amendment rights were violated when private citizens forcibly entered his hardware store and seized his personal property.[3]  "The Fourth Amendment, made applicable to the States by the Fourteenth, provides in pertinent part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992)

---

[3]  From the Court's review of the depositions submitted on summary judgment, as well as Knopick's briefing, it appears the only item of personal property Knopick asserts was taken from the store was his laptop computer, which was returned within days.  He also claims that a certain amount of cash was taken from the store's cash register, and that the cash belonged to him.

(citing *Ker v. California*, 374 U.S. 23, 30 (1963)). "A seizure of property . . . occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* (internal citation and quotation marks omitted). "Whether the Amendment was in fact violated . . . requires determining if the seizure was reasonable." *Id.* at 61–62.

The facts in this case show that Knopick was the owner of the hardware store, and he desired to immediately end his business relationship with the tenant and manager of the store, Mr. Breedlove. Knopick decided to chain and padlock the front doors of the store and change the locks on the back door without first allowing Mr. Breedlove to retrieve his personal property from the store. Knopick claims he did this because he felt he and Mr. Breedlove had reached a mutual agreement that their business relationship had ended, and consequently there was no need for Knopick to adhere to the usual state-law procedures governing evictions. Mr. Breedlove disagreed that he made any such agreement to waive the standard notice requirements required by state law prior to evicting a tenant.

Regardless of the legality of Knopick's actions, it appears Mr. Breedlove decided to take matters into his own hands, and with the help of multiple friends and family members, he ultimately created his own access into the hardware store despite the fact that the locks had been changed. He and others forced entry into the store by removing a piece of weather stripping from a roll-up door in the back of the building. Mr. Breedlove and others then removed a number of items of personal property from the store, including some property that belonged to Knopick.

The only reason that the State is implicated in the acts of these private citizens is because Vickers, the County Sheriff, sent his deputy, Calderia, to the hardware store to be present and "stand by" while Mr. Breedlove removed his property. Vickers and Calderia claim they did not know ahead

-13-

of time that Knopick had padlocked the store and changed the locks. They also claim they did not know Knopick would be absent when the civil standby began. Regardless of their assumptions, however, the question for the Court is whether Vickers and Calderia were so involved in Mr. Breedlove's forced entry into the store and removal of Knopick's property that this private action was transformed into state action implicating Knopick's constitutional rights.

The Eighth Circuit has determined that "[w]hen a police officer is involved in a private party's repossession of property, there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help." *Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005) (internal citation omitted). Considering the facts in the light most favorable to Knopick, and giving Knopick the benefit of any inferences that logically can be drawn from those facts, the Court finds that there is at least a genuine dispute of material fact as to whether the Breedloves' manner of entry into the store and removal of property would not have occurred without Vickers and Calderia's help.

Assuming that state action occurred and Vickers and Calderia are exposed to liability for their involvement in the events at the hardware store, the next issue for the Court is whether they would be entitled to qualified immunity. In examining this issue, the Court must decide, first, whether the facts as Knopick has alleged amount to a violation of a constitutional right, and, second, whether the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The first prong of the analysis weighs in Knopick's favor, as Knopick's Fourth Amendment rights were implicated by the forced entry and search of Knopick's locked store and by the seizure

of Knopick's property without a court order, warrant, or the presence of exigent circumstances. Vickers and Calderia contend that simply because Calderia did not physically assist the private actors in removing the weather stripping from the roll-up door or helping to haul items into the trucks and trailers waiting in the parking lot, no state action occurred.  The Court disagrees and finds that in construing the facts in Knopick's favor, it is probable that none of the private actors at the scene would have attempted to enter the locked store but for Calderia's presence.  Further, there is evidence that Mr. Breedlove and others waited for approval and encouragement from Calderia—who sought and obtained approval and encouragement from his superior, Vickers—before entering the store and removing items of personal property.  Calderia admits he communicated his and Vickers' approval of Mr. Breedlove's plan to force entry into the building by nodding to Mr. Breedlove. Broskovac maintains that Calderia "said it was all right" to enter the store and remove property.  For purposes of the qualified immunity analysis on summary judgment, there is sufficient evidence to find that Knopick's constitutional rights were violated due to the Vickers and Calderia's involvement in the unlawful entry of Knopick's store and seizure of his property.

The second prong of the qualified-immunity analysis asks whether Knopick's Fourth Amendment rights were clearly established at the time of the events in question, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Vickers and Calderia argue that because Knopick did not observe the proper eviction processes mandated by state law, the Breedloves were justified in entering the hardware store in the manner in which they did and physically removing property from the store.  The problem with this argument is that Knopick's alleged failure to observe state-law eviction processes does not justify the Breedloves' violation of Knopick's rights and the state actors'

encouragement and approval of the Breedloves' actions.  The Eighth Circuit has held that officers violate no law when they are called "to a scene not of their making only to resolve a breach of the peace that was in progress." *Moore*, 404 F.3d at 1046.  However, it cannot be said beyond dispute in this case that the forced entry of the hardware store and removal of property was "not of Vickers and Calderia's making," nor can it be said that Vickers and Calderia behaved neutrally in response to a breach of the peace that was already in progress once Calderia arrived.

Viewing the facts in the light most favorable to Knopick, Vickers and Calderia gave permission to, if not actively encouraged, Mr. Breedlove and a number of other private citizens, including those they knew or should have known were not tenants of the store, to violate Knopick's constitutional rights by entering a locked commercial property.  Moreover, Vickers and Calderia gave permission to, if not actively encouraged, various individuals to stream in and out of the store, removing personal property by the truckload, without determining these individuals' relationship to the owner of the store, examining any lease agreements, interviewing the landlord, or verifying that the property being removed actually belonged to those who were removing it.  Though it is true that "mere acquiescence by the police to stand by in case of trouble is insufficient to convert a repossession into state action," *Jones v. Gutschenritter*, 909 F.2d 1208, 1212 (8th Cir. 1990), in the case at bar, considering the facts in the light most favorable to Knopick, it would be clear to a reasonable officer in Vickers and Calderia's position that their  conduct was unlawful.

The qualified immunity defense cannot be salvaged simply by arguing that Vickers and Calderia were "never informed there was a problem while the items were being removed," "never asked to make a decision to stop the removal," or never "told that the Plaintiff's laptop was taken or that the Breedlove's [sic] did not have the lawful right to take it."  (Doc. 50, p. 15).  If Knopick

had a clearly established Fourth Amendment right to be secure in his real and personal property and not to have his property seized, then Vickers and Calderia should have known that allowing or encouraging the Breedloves to break into the store and remove property was unlawful.  Because the qualified immunity defense is not available to Vickers and Calderia on these facts, they will not be entitled to summary judgment based on qualified immunity when the complaint is amended to properly assert individual-capacity claims.

### 3.      Marion County's Liability

The Court now turns to the issue of Marion County's § 1983 liability for acts or omissions undertaken by Calderia and Vickers.  According to *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), a county may not be held liable for the unconstitutional acts of its agents under a theory of *repondeat superior*.  Instead, a county's § 1983 liability must arise due to the unconstitutional acts of its employees pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.*  A county may be held liable for an alleged constitutional violation pursuant to § 1983 if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise.  *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citing *Monell*, 436 U.S. at 691, and *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

In response to the motion for summary judgment, Knopick has failed to identify any official County policy or custom that was a "moving force" behind Calderia or Vickers' conduct, nor has Knopick persisted in his failure-to-train argument.  Instead, Knopick's sole theory of liability against the County is that Vickers, the County Sheriff and a County policymaker, affirmatively intervened to aid or encourage the Breedloves to enter Knopick's store and remove Knopick's personal

-17-

property, such that these acts would not have occurred without Vickers' intervention.  According to the Supreme Court's decision in *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986), municipal liability may attach to a policymaker's single decision to take unlawful action "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives . . . ."

The Court finds that Vickers is vested with decisionmaking authority on behalf of Marion County, and there exists a genuine material dispute of fact as to whether he provided such significant assistance or encouragement to the Breedloves so as to transform the Breedloves' private conduct into state action.  Therefore, summary judgment on the § 1983 claims against Marion County must be DENIED.

**IV.    Conclusion**

For the reasons described above, **IT IS ORDERED** that Defendants Vickers and Calderia are voluntarily **DISMISSED WITHOUT PREJUDICE** from Counts IV-VI of the complaint.

**IT IS FURTHER ORDERED** that Defendants Vickers, Calderia, and Marion County's motion for summary judgment (Doc. 49) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff is granted leave to amend his complaint to properly state individual-capacity claims against Defendants Vickers and Calderia, in the manner indicated in this order such that it complies with the pleading standards articulated by the Eighth Circuit.  No other amendments of the complaint will be permitted.  The amended complaint must be filed **within 5 days of entry of this order**.

The trial of this matter will be reset by separate order.  Notwithstanding the Court's belief that further discovery will not be needed after the complaint is amended, if either party desires a brief

-18-

period of discovery, the parties may conduct such discovery informally prior to trial or file the appropriate motion with the Court requesting that discovery be reopened.

   **IT IS SO ORDERED** this 29th day of October, 2013.

          /s/ P. K. Holmes, III
          P.K. HOLMES, III
          CHIEF U.S. DISTRICT JUDGE